IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



GWENDOLYN D. DOUGLAS,

    Plaintiff,

v.                              Civil Action No. 3:15cv649

OCWEN LOAN SERVICING, LLC,
et al.,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on the MOTION TO DISMISS (Docket No. 10) filed by Ocwen Loan Servicing, LLC ("Ocwen") and Wells Fargo Bank, N.A. ("Wells Fargo"). For the reasons set forth below, the motion will be denied in part and granted in part.

**BACKGROUND**

In her Amended Complaint, Gwendolyn D. Douglas ("Douglas") asserts four claims against Ocwen and Wells Fargo. Those claims arise out of the following scenario, recounted from paragraphs 6 through 77 of Douglas' Amended Complaint (Docket No. 7). The facts are recited as they are stated in the Amended Complaint.

On October 9, 2003, Douglas and her then-husband executed a mortgage loan with First Franklin Financial Corporation as the lender. The loan was properly executed and recorded and created

a lien on the couple's home. The note was then assigned to Wells Fargo, which claims ownership of the note. In 2009, the Douglases entered into a loan modification agreement ("Modification Agreement") with Wells Fargo which provided for the payment of an Unpaid Principal Balance of $179,123.49. (Am. Compl. Ex. A ¶ 1). The initial interest rate under the Modification Agreement was 2.25%, but the interest rate was to increase to 7.25%, effective with the January 1, 2015 payment. (Am. Compl. Ex. A ¶ 2). Saxon Mortgage Services, Inc. was servicer of the note and the deed of trust at that time. Wells Fargo transferred the servicing of the loan from Saxon to Ocwen on April 16, 2010.

The Douglases divorced on July 22, 2010. In the divorce decree, Douglas was ordered to: (1) refinance the loan and, in so doing, to remove her ex-husband from liability on the loan; or (2) sell the home and divide the profits with her former husband. To comply with the order, the Douglases executed a deed of gift in February 2011 that conveyed all interest in the home to Douglas. (Am. Compl. Ex. B). Douglas subsequently recorded the deed of gift in the public land records.

In June 2011, the Douglases and Wells Fargo designated Douglas as the sole obligor on the note by way of an Assumption & Assignment Agreement ("Assumption Agreement"). In the Assumption Agreement, Douglas agreed to assume and pay the

2

obligation in the note, and acknowledged that the property shall remain subject to the deed of trust. (Am. Compl. Ex. C § 2). Douglas agreed to be bound by "all of the conditions and covenants contained in the Promissory Note and Deed of Trust." (Am. Compl. Ex. C § 2). A "Beneficiary Statement" attached to the Assumption Agreement describes the interest rate as "02.2500% FIXED." (Am. Compl. Ex. C).

Douglas contends that, in this transaction, the interest rate on the loan was permanently fixed at 2.25%. In other words, according to Douglas, the Assumption Agreement amended the provision in the Modification Agreement that, on January 1, 2015, the interest rate would increase from 2.25% to 7.25%.

In order to execute the Assumption Agreement, Ocwen charged Douglas $750 in fees. On July 30, 2013, Douglas sent her first qualified written request ("QWR") pursuant to the federal Real Estate Settlement Procedures Act ("RESPA") to Ocwen. This QWR included a cashier's check in the amount of $750 payable to Ocwen for the fees associated with the Assumption Agreement. Ocwen did not process the cashier's check. Instead, apparently having lost the check, Ocwen deducted the fees from Douglas' loan payments.

On September 13, 2013, Douglas sent another QWR requesting that Ocwen complete a Payee Acknowledgement of Stop Payment on Virginia Credit Union, Incorporated Official Check so that

3

Douglas could receive her money back from the unprocessed cashier's check. Ocwen did not comply with the request.

In December of 2014, Douglas' online account began to show a scheduled interest rate increase to 7.25% beginning in January of 2015. The monthly payment was to increase from $1,048.89 to $1,450.84. When Douglas noticed the change, she called Ocwen repeatedly throughout December 2014 to attempt to confirm that the interest rate would not increase from 2.25%. In the telephone conversations, Ocwen denied having record of the Assumption Agreement. Ocwen implemented the increase in the interest rate to 7.5% in January 2015. Douglas had many conversations with Ocwen representatives through May 2015 regarding the increased interest rate.

Douglas made a payment of $1,169.27 to Ocwen on January 8, 2015. Ocwen placed that payment into a suspense account because it was insufficient to cover the new, adjusted 7.5% interest rate payment amount of $1,450.84. Douglas then sent a payment of $281.57 to cover the remainder. For February, Douglas submitted a payment of $1,600.00 to Ocwen to cover the loan payment and a late fee. Further, in February, Ocwen sent Douglas a copy of the Assumption Agreement that did not bear a signature of a Wells Fargo representative, but Ocwen did not explain its position or the significance of its unsigned copy

4

when Douglas had a copy of the Assumption Agreement that Wells Fargo had signed.

Douglas sent two more QWRs on April 7, 2015 and April 13, 2015. On May 8, 2015, Ocwen received a payment from Douglas of $1,100.00. On June 18, 2015, Ocwen received a payment from Douglas of $1,100.00. On July 15, 2015, Ocwen received a payment from Douglas of $1,100.00. Douglas claims that she was current on the loan as of July 15, 2015 because the payments made were sufficient to cover the amounts required by the 2.25% interest rate. Ocwen returned Douglas' June and July payments to her with no explanation.

On June 11, 2015, Douglas, by counsel, sent a QWR. Ocwen sent two responses. On July 25, 2015, Douglas, by counsel, sent another QWR. Ocwen's response admitted and acknowledged that the Assumption Agreement permanently fixed the interest rate at 2.25%. (Am. Compl. ¶ 53).

In Count One of the Amended Complaint, Douglas claims that Ocwen breached RESPA by failure to meet its requirements to accurately respond to and to correct Douglas' QWRs. Douglas further claims that Ocwen's breaches are part of a pattern and practice of noncompliance with RESPA. Douglas seeks compensatory damages and attorney's fees.

In Count Two of the Amended Complaint, Douglas claims that Wells Fargo breached its common law implied covenant of good

faith and fair dealing. Douglas asserts that Wells Fargo breached the implied covenant for "(1) wrongfully claiming that the interest rate on the loan increased as of the January 2015 payment and (2) denying that [the Assumption Agreement] was in effect as to the loan." (Am. Compl. ¶ 63). Douglas seeks compensatory damages.

In Count Three of the Amended Complaint, Douglas claims Wells Fargo breached its obligation of good faith and fair dealing under the Uniform Commercial Code. Douglas seeks compensatory damages.

In Count Four of the Amended Complaint, Douglas seeks declaratory judgment that the Assumption Agreement permanently fixed the interest rate at 2.25% of the loan.

**LEGAL STANDARD**

Defendants have filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must "provide enough facts to state a claim that is plausible on its face." Robinson v. Am. Honda Motor Co., 551 F.3d 218, 222 (4th Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). A court "will accept the pleader's description of what happened ... along with any conclusions that can be reasonably drawn therefrom," but "need not accept conclusory allegations encompassing the legal effects of the pleaded facts." Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 1998); Chamblee v. Old Dominion Sec. Co., LLC, 2014 WL 1415095, *4 (E.D. Va. Apr. 11, 2014). "Twombly and Iqbal also made clear that the analytical approach for evaluating Rule 12(b)(6) motions to dismiss requires courts to reject conclusory allegations that amount to mere formulaic recitation of the elements of a claim and to conduct a context-specific analysis to determine whether the well-pleaded factual allegations plausibly suggest an entitlement to relief." Id.

## ANALYSIS

Ocwen seeks dismissal of Count One. Wells Fargo seeks dismissal of Counts Two and Three.[1] Both defendants seek dismissal of Count Four. Each count will be discussed in turn.

---

[1] It appears that no relief is sought against Wells Fargo on Count One and that relief is not sought against Ocwen in Counts Two and Three.

1.  **Count One: RESPA Claim**

    Under 12 U.S.C. § 2605(e)(2) Ocwen, having received the QWRs, had an obligation to take one of the following actions:

    (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

    (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes –

        (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

        (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

    (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes –

        (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

        (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

    Douglas' claim that Ocwen breached RESPA because it failed to meet its response requirements fails because the facts pled

8

show Ocwen indeed met its response requirements. RESPA provides three ways in which a servicer can validly respond to a QWR. 12 U.S.C. § 2605(e)(2). A servicer can make corrections to the account. 12 U.S.C. § 2605(e)(2)(A). A servicer, following an investigation, can explain or clarify why the account is already correct. 12 U.S.C. § 2605(e)(2)(B). Or a servicer can, after an investigation, provide the borrower with a written explanation or clarification that includes information requested and explain why information not provided cannot be obtained or provided by the servicer. 12 U.S.C. § 2605(e)(2)(C). The District Court for the Southern District of Ohio has elaborated that the servicer does not have unfettered discretion on which response method to use:

> Because these three methods of compliance are presented in the disjunctive, a servicer need not use all three response methods—indeed, § 2605(e)(2)(A) and (B) are, in most factual scenarios, mutually exclusive. However, common sense suggests, and the statute implies (by using language like "if applicable," "to the extent applicable," and qualifiers like "appropriate,") that, depending on the circumstances, one response method may be preferable above others. See 12 U.S.C. § 2605(e)(2). . . . It would, for instance, hardly be broad or liberal construction (as is required for remedial statutes like RESPA) to say that a servicer, presented with a truthful allegation that an account was incorrect, could respond by providing information confirming the error (thereby plausibly meeting 12 U.S.C. § 2605(e)(2)(C)9) but doing nothing about it. . . . Nor would it make sense to allow a

9

> servicer to choose to explain a sham or unreasonable belief that the account is correct (thereby plausibly meeting the letter of 12 U.S.C. § 2605(e)(2)(B)) rather than correcting the account pursuant to 12 U.S.C. § 2605(e)(2)(A). Following a QWR, a company is to choose at least one of the disjunctive response options in 12 U.S.C. § 2605(e)(2) but common sense, plain language, and liberal construction dictate that it must choose the appropriate option under the circumstances.

<u>Marais v. Chase Home Fin., LLC</u>, 24 F. Supp. 3d 712, 721-22 (S.D. Ohio 2014). The undisputed record in this case demonstrates that Douglas challenged, in her QWRs, the correctness of her account and it is an open question on this factual record, whether that challenge has merit. Ocwen, thus, in order to comply with 12 U.S.C. § 2605(e)(2) either needed to correct the account pursuant to 12 U.S.C. § 2605(e)(2)(A) or investigate and explain the correctness of the account pursuant to 12 U.S.C. § 2605(e)(2)(B).

Ocwen clearly did not correct the account and as a result did not comply with 12 U.S.C. § 2605(e)(2)(A). (Am. Compl. ¶ 54, Docket No. 11, at 7). Because Ocwen is only required to use one of the methods of compliance, Ocwen's compliance with 12 U.S.C. § 2605(e)(2)(B) is next examined.

In her response, Douglas admits that Ocwen investigated the matter and provided a statement of reasons. (Docket No. 12, at 10-11). She contests, however, the "reasonableness" or

"adequacy" of the investigation. (Docket No. 12, at 10-11). RESPA has not been construed to require an investigation be "reasonable," only that an investigation be carried out. See Marais, 24 F. Supp. 3d at 723-24 (finding defendant did not meet RESPA's 2605(B)(2) response requirement where defendant "investigated nothing"). In Marais, the court found that an investigation was not carried out where the defendant stamped the QWR upon receipt, responded with a form letter with copies of documents from its online system, and conducted no search or inquiry to test the validity of the complaint. Id. Ocwen's actions clearly go further than the actions of the defendant in Marais as is evident from the documents attached to the Amended Complaint. Thus, Ocwen complied with 12 U.S.C. § 2605(e)(2)(B)(i) and therefore met its obligations under RESPA.[2]

2. **Count Two: Common Law Good Faith and Fair Dealing Claim**

Douglas' claim against Wells Fargo for breach of the implied duty of good faith and fair dealing fails as a matter of law because, although "Virginia law recognizes an implied covenant of good faith and fair dealing in certain contracts[,] . . . no implied duty arises with respect to activity governed by express contractual terms." Skillstorm, Inc. v. Elec. Data Sys., LLC, 666 F. Supp. 2d 610, 620 (E.D. Va. 2009). "[I]n

---

[2] There thus is no need to address Ocwen's request for dismissal on the theory that Douglas had not adequately pleaded damages.

11

Virginia, when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights." Ward's Equip., Inc. v. New Holland N. Am., Inc., 493 S.E.2d 516, 520 (Va. 1997). A breach of the implied covenant of good faith and fair dealing "only gives rise to a breach of contract claim, not a separate cause of action." Albayero v. Wells Fargo Bank, No. 3:11CV201-HEH, 2011 WL 4748341, at *6 (E.D. Va. Oct. 5, 2011)(quoting Frank Brunckhorst Co., LLC v. Coastal Atl., Inc., 542 F. Supp. 2d 452, 462 (E.D. Va. 2008)). "In other words, a defendant cannot breach an implied covenant of good faith and fair dealing by exercising his explicit rights under a contract even though in a manner that the plaintiff does not like." Sun Hotel v. Summitbridge Credit Invs. III, LLC, 86 Va. Cir. 189, 196 (2013).

Douglas claims here that the common law dictates an implied covenant of good faith and fair dealing within the note and the deed of trust. Douglas further claims that the covenant was breached when Defendants allegedly (1) informed Douglas that the interest rate on the loan increased in January 2015 and (2) allegedly denied that the Assumption Agreement was in effect as to the loan.

As presented, Douglas' claim is an attempt "to mask [statutory] violations under the guise of an implied covenant of good faith and fair dealing" and thus should be dismissed with

12

prejudice. De Vera v. Bank of Am., N.A., No. 2:12cv17, 2012 WL 2400627, at *9 (E.D. Va. June 25, 2012). The express contractual provisions of the loan govern the interactions between Wells Fargo and Douglas. Albayero, 2011 WL 4748341, at *15 (noting that a breach of implied duty of good faith and fair dealing cannot arise without a predicate breach of contract claim). Without a separate cause of action for breach of contract, Douglas' claim for a breach of the duty of good faith and fair dealing cannot stand. Therefore, Count Two will be dismissed.

3. **Count Three: UCC Duty of Good Faith and Fair Dealing Claim**

Similar to Count Two, Douglas' claim for breach of the duty of good faith and fair dealing fails because Virginia does not recognize this as a separate cause of action under the Uniform Commercial Code ("UCC"). Charles E. Brauer Co., Inc. v. Nationsbank of Va., N.A., 466 S.E.2d 382, 385 (Va. 1996). The Supreme Court of Virginia has held that:

> Code § 8.1-203 provides: "Every contract or duty within [the U.C.C.] imposes an obligation of good faith in its performance." Thus, while a duty of good faith and fair dealing exists under the U.C.C. as part of every commercial contract, we hold that the failure to act in good faith under § 8.1-203 does not amount to an independent tort. The breach of the implied duty under the U.C.C. gives rise only to a cause of action for breach of contract.

Id. (emphasis added). When parties to a contract "create binding rights, one party does not breach the UCC's obligation of good

13

faith by exercising such rights." Id. at 387. Further, an implied covenant of good faith and fair dealing "cannot be the vehicle for rewriting an unambiguous contract in order to create duties that otherwise do not exist." Skillstorm, 666 F. Supp. 2d at 620.

Douglas has brought no claim for breach of contract under the UCC. And, no independent claim for breach of the duty of good faith and fair dealing exists under the UCC. Therefore, Count Three will be dismissed.

4. **Count Four: Declaratory Judgment**

In Count Four, Douglas asks the Court to declare that the Assumption Agreement "permanently modified the interest rate on the loan to 2.25%." The purpose of a Declaratory Judgment Action is to adjudicate an existing case or controversy.[3]

Defendants argue that declaratory relief is not appropriate here because the alleged offending conduct has already occurred and damages have already accrued. See Hipage Co., Inc. v. Access2go, Inc., 589 F. Supp. 2d 602, 614-15 (E.D. Va. 2008). In sum, say the Defendants, the Amended Complaint seeks to use the Declaratory Judgment Act to redress past wrongs, and that is an inappropriate use of the Declaratory Judgment Act. See Tapia

---

[3] The Court has subject matter jurisdiction because there is diversity of citizenship between the plaintiff and all defendants. Douglas is a citizen of Virginia. Wells Fargo is a citizen of South Dakota. Ocwen is an LLC whose only member is a Florida corporation.

14

v. U.S. Bank, N.A., 718 F. Supp. 2d 689, 695 (E.D. Va. 2010); Calderon v. Aurora Loan Serv., No. 1:10cv129, 2010 WL 2306343, at *7 (E.D. Va. June 3, 2010). The rule on which the Defendants rely is inapplicable because there is an ongoing active dispute over the appropriate interest rate. Thus, declaratory relief will serve its intended purpose here. The motion to dismiss Count Four will be denied.

## CONCLUSION

For the foregoing reasons, the MOTION TO DISMISS (Docket No. 10) will be granted as to Wells Fargo on Counts Two and Three and will be granted as to Ocwen on Count One, and denied as to both Defendants on Count Four.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April 18, 2016

15